Parts With Haiti, Inc. et al. v. Paul Kendrick Good morning. May it please the Court. I'm Brent Singer, attorney for defendant Paul Kendrick, designated as appellant, cross-appellee in this appeal. The law is that domicile is The District Court's order under review is thus organized into findings on Mr. Dimonfeld's physical presence in Haiti and findings on his intent to stay there. The District Court found that his physical presence in Haiti was very substantial, since he lived and worked there for 28 years by the time he filed his complaint in February of 2013, and he continued to live in Haiti thereafter through trial in July of 2015. The District Court found that Mr. Dimonfeld's intent to remain indefinitely in Haiti was firmly established, and that a strong case can be made that he intended to remain in Haiti for the remainder of his life. On that basis, the Court found that he was domiciled in Haiti when he filed his complaint. The Court reviews these findings on physical presence, intent, and domicile only for clear error. The findings on physical presence are unassailable. The evidence is conclusive and not disputed that he lived for, starting in 1985, he lived for six months at Delmas 47 in Port-au-Prince, and then lived for decades thereafter through 2013 in Haiti at his residence at Delmas 91 in Port-au-Prince. The finding that Mr. Dimonfeld intended to stay in Haiti indefinitely, most likely permanently, is equally unassailable. Mr. Dimonfeld was asked... What about the fact that all of the indicia of domicile in Iowa predates this lawsuit by a significant period of time? He came from there, he had the room in the house, he had a bank account there, he was registered to vote there even though he didn't vote there. All of those things had nothing to do with this lawsuit. So doesn't that say something about his intent? Well, no, your honor, because overwhelming evidence of his conduct and his subjective intent long before the lawsuit also established his intent to stay in Haiti indefinitely when he got there in 1985 and thereafter permanently. So, for example, before the jurisdictional issue came up, he was asked point blank at his deposition whether or not he was a permanent resident of Haiti, and he said, exactly. Then other evidence of his domicile long predates his case, such as ownership of real estate in Haiti, ownership of the personal property located there, payment of taxes in Haiti, not Iowa. And, in addition, the district court credited, and I think it was within its rights to, Exhibit Hearing 75, which establishes that Mr. Gallifrey even built a crypt for himself. Again, this was long before the jurisdictional issue arose in Haiti, which was to be his final resting place, as he indicated to a Catholic priest who was visiting him at the time. There was much additional evidence of domicile in Haiti that the district court could have For one thing, he was at his deposition before notice of the jurisdictional defect. He confirmed and wrote that, according to him, quote, my whole life is Haiti, unquote. And that says it all. Again, when asked at the jurisdictional hearing whether it is correct that he always returned to Haiti whenever he left, he said, that's correct. That's that hearing transcript, page 85, at appendix 361. I'd like to make a couple points on the second issue of whether or not the court may preserve the verdict for Hartz V, and simply dismiss Mr. Gallenfeld as a non-diverse party. And the first point that I'd like to make, obvious though it may be, and also may I reserve a little. It's too late. We'll see if you get surprised. That's fine. I'd like to make one point, that although courts sometimes write as though the test of whether to preserve a verdict by dismissing a non-diverse party is a Rule 19 indispensability test, that's not quite true. The factors set forth in Rule 19b, as I understand it, are only a handy criteria adopted by the court in starting the analysis. And the express 19b factors are not even exhaustive, as courts have remarked. And in Newman Green itself, for example, whether the, in this case, coplain of Hartz V Haiti, had a tactical advantage at trial by the presence of the non-diverse party. So the point in cases like ours is that a non-diverse party has already been joined through trial. And so the question is, so what do we do? And not whether some absent party must be joined. So Rule 19a, persons required to be joined if feasible, doesn't even come into play. And that's the mistake that the plaintiffs make in their gray brief in relying very heavily on a case named Delgado, a First Circuit case in 1998. Since Delgado is only about whether an individual never a party to the action was required to be joined under Rule 19a. The court held that the district court erred in its 19a analysis concerning the meaning of, quote, inconsistent obligations, unquote. It's true that the absent party in Delgado, if joined, would have destroyed diversity. But the case turned on whether the absent party was even required to be joined under Rule 19a, which is not the question at all in our case. I'd also like to speak briefly about the standard of review applied to the district court's Rule 19b, Moon and Green determination. I think the case law including CP Solutions, a First Circuit case in 2009, establishes that the correct standard of review is for an abuse of discretion. The plaintiffs assert in their gray brief that the standard of review should be de novo. I think the mistake the plaintiffs make there is that they confuse the fact that this court has the power to make a Moon and Green Rule 19b determination in the first instance on its own in some cases where, for example, the defect, jurisdictional defect, is first noticed on appeal. They confuse that fact with the question of what standard of review applies when the district court has actually made the determination. So the fact that this court has the power on its own to make the determination doesn't mean that it doesn't defer to the district court when the district court has in fact made the determination, especially in a case like this where it was remanded, there was a full evidentiary jurisdictional hearing and the district court sat through three weeks of testimony at the original trial. I think the district court's application of the Rule 19b factors was textbook, really. The first factor of whether a party is central to the dispute and extensively involved in the case, the district court explains how Hartsworth-Meadie's case was, quote, deeply intertwined with and even, quote, collateral and, quote, derivative of Mr. Geilenfeld's claims, which is true because the core issue for the entire case was whether or not Mr. Geilenfeld was a pedophile, is a pedophile, as Mr. Kendrick stated. I think the district court's analysis of the Rule 19b factor of whether or not letting the Hartsworth-Meadie judgment stand might prejudice Mr. Kendrick, is again textbook. Namely, in a subsequent state court case brought by Mr. Geilenfeld, a preserved valid and final judgment for Hartsworth-Meadie would preclude Mr. Kendrick from relitigating critical issues like whether Mr. Kendrick spoke falsely and with reckless disregard for the truth. In other words, if Mr. Geilenfeld sued Mr. Kendrick in state court and used a preserved final and valid judgment for Hartsworth-Meadie against Mr. Kendrick, Mr. Kendrick would be put in the water, unable to be litigated. And that follows from a straightforward application of the species of issue preclusion, which the court is familiar with, called offensive non-mutual collateral estoppel, a doctrine which is applied essentially the same in Maine courts as in federal courts. Can I ask you a question about that? All of this makes sense to me if this jurisdictional question is being decided up front and the court. But here we've got 20-20 hindsight with the person who participated fully in the trial. Why wouldn't that make any difference? We've already had a trial. We've already had all this full participation. It's really not an absent party. It's a bedrock principle of our judicial system, federal judicial system. It's of limited jurisdiction. The principle has been established since that we... Do you have a case that you can cite that says what the rule should be when we're looking backward as opposed to if this jurisdictional question had been answered at the beginning, the 19B and thus the jurisdictional question? The case of looking backwards, I would have to defer to the brief, although there was a case, I believe, with... Cited by them in their brief, I think, was a looking backward case. But the looking backward, I don't think, is of legal significance here because the test... In fact, the test can be applied even probably better in retrospect. For example, New England Green itself, I think, may be a looking backward case because one of the questions it asked specifically was, or at least it instructed the lower courts to look at, is whether or not the non-diverse... I'm sorry, whether the diverse party may have gained a practical advantage at trial because of the presence of the non-diverse party at trial. So it doesn't make any sense to ask that unless you're looking backwards. And it just makes sense that if the defendant in this case, Mr. Kendrick, was tactically disadvantaged by the presence at trial of a non-diverse party, it cannot preserve the verdict, cannot preserve the verdict if preserving the verdict would prejudice him. The test simply is a knowing to me whether in equity and good conscience the verdict can be preserved. We're certainly aware of the fact that a lot of time and effort went into the trial. And certainly ever since this occurred to us about a year ago, Mr. Kendrick has pointed blame at Mr. Kendrick and cried unfairness. But the fact is the plaintiffs, the district court, and Mr. Kendrick all overlooked this point of the law until about a year ago. I suspect that this court might have caught it, might have seen it and raised it at oral argument. But regardless, the plaintiffs must bear some, maybe the biggest share of the blame since they chose the form and knew best the circumstances of Mr. Gottenfeld's domicile. At the end of the day, if at the start of the case, the plaintiffs always thought diversity was based on his Iowa domicile, then to Mr. Kendrick it strains credibility to suppose that they would not have pled it from the outset. Thank you, Your Honor. Thank you. May it please the court, Russell Pierce and I'm here on behalf of both plaintiffs, the non-profit corporation Hearts with Haiti and humanitarian missionary Michael Geilenfeld. Picking up on the last point, we made a mistake in our pleadings. And I believe it was just about four years ago today when that complaint was served upon Mr. Kendrick, the defendant. The mistake we made in the pleadings was we failed to allege citizenship of any of the parties. We alleged residency. The mistake derived from the fact that residency is a common allegation in state court filings where residency is pertinent to venue. That mistake in the pleadings was not intended to convey that Mr. Geilenfeld was not a citizen of Iowa as he claimed all along. He held himself out as a citizen of Iowa before suit. Mr. Kendrick himself referred to Mr. Geilenfeld as a U.S. citizen of and from Iowa in his defamatory writings before suit. The Iowa address was used as the home occupancy address for Mr. Geilenfeld's FOIA request served before suit. And of course we know that the voter registration, driver's license, bank accounts and the continuing And so recognizing that there was an error in the pleadings and that error in the pleadings was picked up when this court was undergoing the jurisdictional review, we recognized that that omission in the pleadings would call for correction, would need correction. And so we moved under section 1653 for amendment of the pleadings. That motion was met with the motion to dismiss for lack of jurisdiction filed in this court and then this court remanded for jurisdictional findings. And you agree that that's always open? Yes, yes. The unfortunate aspect of this case, however, is that Iowa domicile or Iowa citizenship was not omitted from trial altogether. Mr. Geilenfeld did testify, did refer to Iowa as his quote home in response to one of his trial testimony, in response to one of the questions put to him at trial. And in addition, and this is perhaps a key factor on the continuing domicile issue here, he testified that in 1985 when he left the formal Sister Teresa Missionary Brothers of Charity to continue his missionary work abroad and specifically in Haiti, that that was a religious decision that he made, he referred to it at trial as an authentic call from God. And the importance of that is that he was underscoring that where he had been a missionary working abroad when he was a member of the Brothers Order up until 1985, he had the benefit of the Iowa citizenship, the continuing domicile doctrine. And the district court agreed with that principle. But once he left the order, he was no longer under the order's control as to where he was, as to what parts of the world he did his mission in. That was decided by the hierarchy rather than by him. And so once he said, I don't want to do that, and he said, I want to do my own form of charity in Haiti, he left the order. And therefore, whatever the past was, doesn't that get, in a sense, erased? So that when the court had to look at, when we sent it back and the judge had to look at it, he had to look at all these factors and balance the factors. And I've tried to do that by charts, balance the factors, and he balanced them. And so that's the one place where we contend that under the clearly erroneous standard, this court should have a definite and firm conviction that a mistake was made. Because the change in 1985 when he left the Brothers, he was still under the vow of poverty and still under the vow of obedience to an authentic call from God. So it was the same missionary work, the same work. Except that rather than someone else being able to determine where he did that work, he took that upon himself. I'm not suggesting that wasn't appropriate, but he did take it upon himself. And doesn't that change the equation? No, no, it should not change the equation. Because before he was a missionary working abroad, claiming state citizenship in Iowa. After it, he was a missionary working abroad with the same humanitarian interests and the same authentic call from God, claiming citizenship in Iowa. Except when he was asked these questions, and it seems to me, he indicated that Haiti was his home. And that he intended to stay in Haiti. And his connection to Iowa was pretty thin. No, well, no. Because his connection to Iowa is significant. That's his claim to state citizenship as a United States citizen. And really the framing of the issue should be more, will the federal courts accept a United States citizen's claim to one state citizenship? This is not a fight over whether he was from the state of Maine or from Iowa. All he wants is to claim one state citizenship while he is a United States citizen working abroad. And yes, he spent a significant amount of time, and the missionary work did call for his time in Haiti. But he returned to Iowa. He did consider it his home. He testified at the jurisdictional hearing that in essence he had two residences, two homes. And you can have more than one residence. And you can spend more time in one residence over your domicile state. And certainly in the cases that involve missionaries working abroad or missionary doctors or students working abroad, that would be the case. They would spend more time in their humanitarian missions than in their home state. But they still have the indicia like the exercise of political rights, voter registration. And in this case, the key bank account for all of his life was in Iowa where donors to the charitable projects in Haiti or wherever they were. They were in Haiti at the time, would donate to the Iowa bank account. So the significance really of the change in 1985 of leaving the brothers. The other concern that we have is that if the federal courts put all of the emphasis on that change in a formal affiliation with a recognized religious group as being the key difference on why a missionary working abroad cannot claim Iowa citizenship, then our concern is, is the court then broaching the First Amendment religious entanglement issues because the court is now passing judgment upon or treating Mr. Geilenfeld differently based upon a religious decision that he made. Not based upon any difference in the actual work he underwent. Well, it seems to me that the thrust of Judge Stahl's question does not lead to a suggestion that he is being treated differently because of his religion, but rather he is being perhaps treated differently because the choices that he made after the point Judge Stahl spoke of were choices that he was making, not choices that were being made by him for others. In other words, the difference is not his religious authenticity, but the volitional nature on his own part of what he is doing. And I wasn't going to ask this question, but it seems to me that your argument is that by following what he believed was a commandment of God, there is no volition on his part and God has taken the place of the orders from the Brotherhood. And I don't know that we can draw or a federal court should draw a distinction between individual volition and the attribution of that volition to the deity. Well, I think that the issue of volition, it goes to the concept of subjective intent, which underlies a person's intent to claim a state citizenship or to claim a state domicile. And so our point with the authentic call to God is that he has the same ongoing intent to maintain Iowa's citizenship throughout this period of time. And if we accept, as the district court did, that he would maintain that state citizenship before 1985, then there would be no reason to change that simply because, especially when his subjective intent remains genuine. Well, but his subjective intent is also to be judged by some of the quotations that we have already heard. My life is in Haiti, I always return to Haiti, my earthly remains are going to remain in Haiti. And that is circumstantial evidence of subjective intent too. The permanent residency issue arose in a separate context at a pretrial deposition. He was not confronted with that testimony during the jurisdictional hearing. And his testimony in the jurisdictional hearing is that his time in Haiti was on the annual permi de cejour missionary visa that the Haiti government provides and renews each year. That's because that's the only way the people in the government of Haiti would let him stay. He was trying to explain in his deposition why it is that he could have the property of the charitable missions in his name and trust for the missions if he was a United States citizen. And the word permanent resident came from the examiner. Should there have been, again, should there have been a correction, there might have been, but the trial corrected his trial testimony where he talks about being from Iowa and returning to Iowa. Yes, he returned to Haiti, but he also returned to Iowa each time he went to Haiti. This is a clearly erroneous standard of review, correct? Yes, yes. And when you have, perhaps I might have balanced this differently, but how can that be clearly erroneous here given what the district court did? Well, again, because the district court accepted the concept that if he was a missionary working abroad as a member of the order, then he would be entitled to claim state Iowa citizenship. Yes, but he was no longer that when the district court had to make his determination. And we sent it back for him to make a determination. He balanced all of these things and he came down on the side saying that he was not a domicile in Iowa and we have a clearly erroneous standard of review. And I have a hard time trying to put my mind around it. It's not so much a factual issue, it's really the application of law, because the clearly erroneous standard is a mixed question of law and fact. So that is really what we're pointing out. It's the application of law to the undisputed set of facts and the undisputed genuine intent on our client's behalf to claim Iowa citizenship. Do we have to, in order to do what you want, accept your view that the change between his being a member of the order and his running his own show is irrelevant? That God either way determined what he was doing? It's irrelevant in the sense that it did not change his genuine intent to continue to claim Iowa citizenship, which is then reaffirmed when he moves to Cedar Rapids and registers to vote in Linn County and all of those other indicia that line up with the Lundquist and the Bank One criteria. Before I finish, I do want to address the other Newman Green issue in the case. Because this issue was raised on appeal, the Newman Green standard, and I think it's really where the Supreme Court, it's around page 838, 837, 838, where the Supreme Court talks about the direction that the federal court should take in matters where there has been a full-fledged jury trial and the jurisdictional spoiler issue was raised at the very end, is just to examine whether there's prejudice to any of the parties. Mr. Geilenfeld has asked to be dropped from this case. Hartsworth, Haiti would accede to that request. We ask this court to grant Mr. Geilenfeld's request to be dropped as a jurisdictional spoiler and there's no prejudice to Mr. Kendrick in dropping Mr. Geilenfeld as the plaintiff. He gets out from under Mr. Geilenfeld's judgment. Thank you.